No. 88,991

ARY JEWELERS, L.L.C., *Appellee,* v. SCOTT KRIGEL, INDIVIDUALLY
AND AS TRUSTEE OF THE SCOTT W. KRIGEL REVOCABLE TRUST,
*Appellants.*

(82 P.3d 460)

Opinion filed
December 31, 2003.

*Sanford P. Krigel,* of Krigel & Krigel, P.C., of Kansas City, Missouri, argued the cause, and *Karen S. Rosenberg,* of the same firm, was with him on the briefs for appellants.

*Barry L. Pickens,* of Spencer Fane Britt & Browne, LLP, of Kansas City, Missouri, argued the cause, and *Michael C. Leitch,* of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

NUSS, J.: This case involves a dispute over escrowed funds. ARY Jewelers, L.L.C., (ARY) contracted to buy Krigel's, Inc., which owned and operated a jewelry business in several Midwestern states. After the sale failed, a Johnson County District Court granted summary judgment to ARY and ordered return of its $1.5

million in escrow. Scott Krigel, individually and as trustee of the Scott W. Krigel Revocable Trust which owned the company stock (collectively the Krigels), appealed not only the grant of summary judgment to ARY but also the denial of their own summary judgment motion based upon breach of contract. We transferred the case from the Court of Appeals on our own motion pursuant to K.S.A. 20-3018(c).

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the district court err in granting summary judgment to ARY because the court misinterpreted the contract? No.
2. Did the district court err in granting summary judgment because genuine issues of material fact remained on the issue of estoppel? No.
3. Did the district court err in granting summary judgment because genuine issues of material fact remained on the issue of waiver? No.
4. Did the district court err in denying the Krigels' motion for summary judgment because the court misinterpreted the contract? No.

Consequently, the judgment of the district court is affirmed.

## FACTS

Krigel's, Inc., a family-owned Kansas corporation operating jewelry stores across several Midwestern states, began having financial problems early in 2000 and soon became insolvent. Scott Krigel (Scott), on behalf of the Scott W. Krigel Revocable Trust, began to seek a buyer for the family business. On November 21, 2000, following extended negotiations with Gohar Husain, both Scott on behalf of his trust and Husain on behalf of ARY signed a Stock Purchase Agreement (SPA), which provides the basic dispute in this case.

The SPA called for Krigel's, Inc., to file for Chapter 11 bankruptcy. After approval of the bankruptcy court and sale closing, ARY was to purchase all of the stock of Krigel's, Inc., with $50,000 escrowed at Assured Quality Title Company. Upon closing, ARY was also to pay 60% of the debt owed to each of Krigel's, Inc.'s

unsecured creditors and assume responsibility for or pay off all debt Krigel's, Inc., owed to its only secured creditor, Foothill Capital Bank (Foothill Capital). ARY's obligation to Krigel's, Inc.'s unsecured creditors approximated $6 million. ARY's obligation to Foothill Capital approximated $8 million at the time the parties signed the SPA.

The same day as the SPA's execution, Husain, again on behalf of ARY, and Scott, on behalf of himself and Krigel's, Inc., signed a Consulting and Noncompetition Agreement for Scott Krigel (consulting agreement). It required ARY to hire Scott as a consultant for up to 1 year and forbade him from competing with ARY in the area of existing Krigel's, Inc., stores for 2 years. In exchange for these considerations, ARY was to pay Scott $1,450,000 from a second escrow account it funded at Assured Quality Title. In short, ARY's cash obligation at closing totaled $7.5 million — the $6 million to Krigel's, Inc., unsecured creditors and the $1.5 million for the company stock and Scott's considerations.

The SPA provided at paragraph 9, and the consulting agreement at paragraph 19, that if ARY failed to provide proof of its ability to pay unsecured creditors prior to Krigel's, Inc., bankruptcy filing or if it failed to pay the unsecured creditors on the effective date of the bankruptcy plan, then the Krigels would immediately be entitled to the escrowed $1.5 million.

Of great importance to this case is paragraph 4(c) of the SPA, which contains the "Foothill Capital financing condition." It provides as follows:

"4. Representations, Warranties and Covenants of Purchaser. Purchaser hereby represents, warrants and covenants to the Seller that:

. . . .

(c) Within four weeks from the date hereof [December 19] Purchaser shall provide Seller with evidence of *Foothill Capital's consent to the continued financing of Company's obligations to Foothill Capital*. In the event Foothill Capital does not consent within the foregoing time period this Stock Purchase Agreement and related agreements shall be void and of no further effect." (Emphasis added.)

Paragraph 5(c) repeats the unfulfilled condition's nullifying effect on the SPA but provides for the possibility of waiver. It states in relevant part:

"5. Seller's and Purchaser's Conditions to Closing

"In addition to the conditions set forth in Section 6 below, Closing shall be subject to the following conditions:

. . . .

(c) If any of these conditions have not occurred as of the Closing Date [December 19], this Agreement shall be null, void and of no further effect, *unless any such unfulfilled conditions are waived by the affected party.*" (Emphasis added.)

Paragraph 6(a) of the SPA repeats the waiver possibility. It states in relevant part:

"6. Conditions to Closing. The obligation of each party to proceed to closing is subject to the following conditions:

(a) The parties shall not be in breach of the conditions specified in Section 5 above, *unless waived by the affected party.*" (Emphasis added.)

Under paragraph 8(d), a waiver is required to be submitted to the opposing party in writing: "All notices, requests, demands, and other communications required or permitted to be given hereunder shall be in writing . . . ." Paragraph 8 continues at subsection (e) with integration language:

"Entire Agreement. This Agreement (including the Exhibits referred to herein) sets forth the entire Agreement and understanding of the parties with respect to the transactions contemplated hereby and supersede[s] all prior agreements, arrangements, and understandings, whether written or oral, related to the subject matter hereof. *No representation, promise, inducement or statement of intention has been made by any party hereto which is not embodied in the Agreement or in the Exhibits attached hereto or the written statements, certificates or other documents delivered pursuant hereto.*" (Emphasis added.)

Following the agreements' execution, all parties agreed Scott would lead the negotiation for continued financing with Foothill Capital because Krigel's, Inc., had a working relationship with the bank. Four days before the December 19, 2000, closing date, Thomas Morgan, Vice President of Foothill Capital, notified ARY and Scott of his company's interest in providing ARY bankruptcy emergence financing as follows:

"December 15, 2000
"Mr. Gohar Husain
"ARY Jewelers, LLC
"Re: Emergence Financing Proposal Letter

"Dear Mr. Husain:

"In accordance with Foothill Capital's discussions with Stuart Fetter and Scott Krigel, President of Krigel's Jewelers it is Foothill's understanding that ARY, LLC's intends to purchase 100% of the stock of Krigel's Jewelers. This is further evidenced by the execution of that certain 'Stock Purchase Agreement' dated November 21, 2000. It is Foothill's understanding that Krigel's Jewelers anticipates filing for Chapter 11 protection on or about January 15, 2001 and will exit shortly thereafter under ownership of ARY, LLC. *Please let this letter serve as an expression of Foothill Capital's interest in reviewing the opportunity to provide emergence financing for Krigel's Jewelers under ARY, LLC's ownership, but should not be considered a commitment to lend.*" (Emphasis added.)

Morgan went on to propose loan terms significantly different than what Foothill Capital had granted Krigel's, Inc., prior to its insolvency. After Scott reviewed a copy of the letter, he concluded it did not satisfy the requirement of Foothill Capital's consent under SPA paragraph 4(c). Nevertheless, he forwarded it via email to ARY's Husain with the following endorsement:

"Dear Gohar,

"I just received the correspondence that you and I have been waiting for from Foothill. I have attached a copy of Foothill's letter to this email. As you can see from the letter, it appears that Foothill will be willing to provide Krigel's with financing. Krigel's accepts this letter as complying with paragraph 4(c) of the Stock Purchase Agreement. Please let me know if this meets with your approval.

"Scott Krigel"

In an affidavit submitted to the district court, Max Jevinsky, ARY's attorney, claimed that on December 19, 2000, he notified Krigel's, Inc., by letter that Foothill Capital had not consented to continued financing within the terms of paragraph 4(c). Nevertheless, he requested an extension of the consent period to January 18, 2001. His letter provided:

"Dear Mr. Krigel:

"I have reviewed Tom Morgan's Emergence Financing Proposal Letter of December 15, 2000 (the 'Proposal').

"Paragraph 4(c) of the Stock Purchase Agreement (the 'Agreement') speaks in terms of 'Foothill Capital's consent to the continued financing of the Company's obligations to Foothill Capital'. The Proposal, however, is merely a terms sheet and cannot reasonably be considered a 'consent'. As such, it does not satisfy the requirement of paragraph 4(c) of the Agreement.

"That being said, ARY is satisfied that it and Foothill Capital can satisfactorily and in good faith negotiate a lending commitment shortly after Mr. Husain's

return to the United States, and that the Proposal will be considered acceptable for purposes of the Agreement. However, Mr. Husain is presently unable to discuss this matter with his principals as they are not available during the observance of Ramadan.

"It is my understanding that you and Mr. Husain spoke after our conversation on Saturday, and that you have no objection to a short extension of the time period of paragraph 4(c) of the Agreement. We realize that ARY will not have a formal commitment from Foothill Capital by then, but we merely want to have a greater level of comfort that the Proposal will in fact result in a timely lending commitment on mutually acceptable terms.

"I recommend that the acceptance period in paragraph 4(c) of the Agreement be extended to January 18, 2001. This would slightly delay your formal notification of vendors, but that appears to me to be not particularly significant since you have already notified the majority of the holders of the largest claims, and they are apparently enthusiastic and supportive of the Company's plan. This slight delay will not affect the schedule for filing and obtaining acceptance of the reorganization plan.

"If you are agreeable to the recommended extension I will appreciate your signing the enclosed duplicate of this letter and returning it to me. Thank you for your continued cooperation.

> "Very truly yours,
> "Berman, DeLeve, Kuchan & Chapman. L.C.
> [signature]
> Max Jevinsky"

Jevinsky claimed he received no response to his letter. ARY and Krigel's, Inc., continued to negotiate with Foothill Capital, however, to try to salvage the transaction. One day after the expiration of Jevinsky's proposed extension, January 19, 2001, despite the continued problems experienced in obtaining Foothill Capital's consent to financing, Scott directed counsel for Krigel's, Inc., to file for Chapter 11 bankruptcy.

ARY admits that at least twice it attempted to intervene in the bankruptcy action to seek delays allowing it sufficient time to complete financing negotiations with Foothill Capital. In response to ARY's second request for additional time, Krigel's, Inc.'s attorneys moved the bankruptcy court to delay the effective date of their petition to March 30, 2001. Moreover, according to Scott, ARY's Husain had repeatedly and consistently stated to him that (1) if favorable financing could not be negotiated, ARY would close the SPA by paying cash, and (2) ARY could pay Krigel's, Inc., unse-

cured and secured debt by paying cash and that financing was not necessary. He also alleged that no ARY representative ever informed him during the negotiation of the SPA that ARY required acceptable financing to proceed with the SPA.

ARY's negotiations with Foothill Capital continued into March 2001 without success. Finally, on March 28, ARY notified Krigel's, Inc., that if Foothill Capital did not approve continued financing on the same terms as Krigel's, Inc., had enjoyed prior to insolvency, ARY would consider the SPA void.

Two days later, on March 30, 2001, — the extended effective date of the bankruptcy — ARY failed to close on the SPA and failed to pay Krigel's, Inc., unsecured creditors. Because of ARY's alleged failure to perform, the next day Scott made a demand on Assured Quality Title for release of the escrowed $1.5 million per the default provisions of the agreements. ARY contested the demand and claimed the entire transaction void due to Foothill Capital's failure to agree to continued financing on the same terms as Krigel's, Inc., had enjoyed prior to insolvency.

That same month, April 2001, ARY filed a petition for declaratory judgment in Johnson County District Court and amended the petition on June 13, 2001, essentially seeking return of its escrowed funds. On August 9, 2001, Scott and his trust filed an answer and a counterclaim for breach of contract seeking possession of the funds.

After discovery closed, the parties filed motions for summary judgment on February 27, 2002. The district court found the terms of the SPA were unambiguous. Considering only the "four corners" of the agreements, the court held that SPA paragraph 4(c), which contained the Foothill Capital financing condition, "affected" both parties. The court further concluded that since ARY had not submitted a written waiver, the agreements were null and void:

"Based on the uncontroverted facts set forth above, the Court concludes that paragraph 4(c) of the SPA is a representation and warranty of ARY to Krigel. Krigel waived the requirements of that paragraph by sending written notice of his waiver to Gohar Husain on December 15, 2000. However, paragraph 4(c) also affected the purchaser, ARY. Thus, pursuant to SPA ¶¶ 5(c) and 6(a), ARY would

also have to waive it, or Foothill's lack of consent to financing rendered the SPA and related agreements null and void.

"While it is alleged that ARY's representative, Gohar Husain, may have orally told Scott Krigel that ARY would close the transaction even without continued financing from Foothill, neither Mr. Husain nor any other representative of ARY ever waived the requirements of SPA paragraph 4(c) in writing. The SPA requires waivers, and all other communications permitted or required under the SPA, to be in writing. Therefore, ARY did not waive paragraph 4(c), and by the express terms of paragraph 4(c), the SPA and the ancillary Consulting Agreement were null and void as of December 19, 2000."

As a result, the district court denied the Krigels' motion for summary judgment, granted ARY's motion, and ordered Assured Quality Title to release the escrowed $1.5 million to ARY.

## ANALYSIS

Issue 1: *Did the district court err in granting summary judgment to ARY because the court misinterpreted the contract?*

The Krigels first claim the district court misconstrued paragraph 4(c) of the SPA as a financing term which affected both parties. They argue that because the term was a representation and warranty made by ARY for the sole benefit of the Krigels, the Krigels alone could and did properly waive the provision under paragraphs 5(c) and 6(a). Since they properly waived this provision, the Krigels allege ARY had no valid reason not to perform its obligations and consequently is in breach, entitling the Krigels to the $1.5 million in escrow.

We first observe that the parties elected to have the SPA governed by Missouri law. Accordingly, we apply Missouri's substantive law and rules of contractual construction in our de novo review. See *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001) (The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review.). Our interpretation of this contract is therefore governed by the principles stated in *Armstrong Business Services, Inc. v. H&R Block*, 96 S.W.3d 867, 874 (Mo. App. 2002):

"The cardinal rule in contract interpretation is to ascertain the intention of the parties and to give effect to that intention. *Atlas Reserve Temporaries, Inc. v. Vanliner Ins. Co.*, 51 S.W.3d 83, 87 (Mo. App. 2001) (quoting *J.E. Hathman, Inc.*

*v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 [Mo. 1973]). Unless the contract is ambiguous, the intent of the parties is determined based on the contract alone, not on extrinsic or parol evidence. [Citation omitted.] In determining whether a contract is ambiguous, words should be given their natural and ordinary meaning. [Citation omitted.] A contract is ambiguous if its terms are reasonably open to more than one meaning, or the meaning of the language used is uncertain. [Citation omitted.] A contractual provision is not ambiguous merely because the parties disagree over its meaning. [Citation omitted.]"

Against this backdrop, we consider whether the Krigels had the sole authority under paragraphs 5(c) and 6(a) to waive the unfulfilled condition contained in paragraph 4(c). In particular, we consider the possible waiver of Foothill Capital's failure to consent within 4 weeks of the date of the SPA to the continued financing of Krigel's, Inc., obligations to Foothill under the prebankruptcy terms. These paragraphs were previously set forth in this opinion.

The district court held that paragraph 4(c) was a representation and warranty of ARY to "Krigel," and Scott waived the unfulfilled condition by sending written notice of waiver to Husain on December 15, 2000, per paragraphs 5(c) and 6(a). The court additionally held that ARY was required to waive the unfulfilled condition because the condition also affected ARY as a party as stated in paragraphs 5(c) and 6(a).

We agree with the district court. Without Foothill Capital's continued financing of Krigel's, Inc.'s secured debt of $8 million under the prebankruptcy terms, ARY would have been obligated to add this amount in cash to its $7.5 million cash outlay at closing. This makes a substantial difference to a buyer, and therefore ARY was affected by paragraph 4(c). Under paragraphs 5(c) and 6(a), ARY also was required to waive the unfulfilled condition, which it did not do.

Issue 2: *Did the district court err in granting summary judgment because genuine issues of material fact remained on the issue of estoppel?*

The Krigels argue that genuine issues of material fact exist to prevent summary judgment for ARY. Specifically, they claim that ARY's representatives' statements and acts estop ARY from relying upon paragraph 4(c)'s unfulfilled condition of Foothill Capital's

consent to continued financing, even though ARY had not waived that provision in writing as required by paragraph 8(d). ARY responds that we should not consider this argument because the Krigels did not plead estoppel in the district court.

Our first step is to determine whether the Krigels adequately raised the theory of estoppel in pleadings below. If not, the issue cannot be raised on appeal. See *Dalmasso v. Dalmasso,* 269 Kan. 752, 765, 9 P.3d 551 (2000) (Issues not raised before the trial court cannot be raised on appeal.).

We initially observe that the district court did not mention estoppel in its journal entry of judgment filed on May 29, 2002, which suggests the issue was not adequately raised by the Krigels at that level. A careful review of the pleadings converts this suggestion into a certainty. We have examined ARY's amended petition for declaratory judgment, the Krigels' answer and counterclaim for breach of contract, and ARY's reply to the counterclaim. Estoppel is not mentioned except by ARY as an affirmative defense to the Krigels' counterclaim in accordance with K.S.A. 60-208(c) ("In pleading to a preceding pleading a party shall set forth affirmatively . . . estoppel.").

We have also carefully examined the Krigels' motion for summary judgment on their counterclaim and on ARY's amended petition, as well as ARY's memorandum in opposition. Additionally, we have reviewed ARY's own motion for summary judgment, the Krigels' response, and ARY's reply. Despite the Krigels' opportunities to mention estoppel in two different dispositive pleadings, they did not do so. Neither did ARY.

We do acknowledge that in the Krigels' response to ARY's motion for summary judgment, they argued in relevant part:

"ARY Jewelers never asserted until March 28, 2001, and thereafter that it had to secure a commitment for adequate financing as a condition to its closing the SPA. To the contrary, Gohar Husain, ARY Jewelers member and representative, repeatedly stated that if negotiations for financing were unsuccessful, ARY Jewelers would proceed with the closing and pay cash. . . .

. . . .

"The alleged facts set forth by ARY Jewelers misconstrue what actually occurred during the negotiation process. Additionally, ARY Jewelers' version of the facts completely ignores the repeated representations made by ARY Jewelers' author-

ized representative, Gohar Husain, which were directly contrary to the assertions now made by ARY Jewelers.

"Gohar Husain **repeatedly** told Krigel that ARY had a lot of money and that they could make the deal work even without obtaining suitable financing. Mr. Husain told Krigel from the very start of the negotiations that both the secured and unsecured debt would be paid by cash if the negotiations for financing were unsuccessful. . . .

"Moreover, ARY Jewelers' attorney in the chapter 11 bankruptcy proceedings stated during at least two hearings that he was urging ARY Jewelers to close the SPA. At the hearings where ARY Jewelers requested an extension to the effective date of the plan, ARY Jewelers' never represented to the Court that ARY Jewelers could not close the SPA because the so-called financing contingency had failed."

These arguments, however, appear under the Krigels' chosen heading of "parol evidence." While headings are not necessarily dispositive of the issue, the Krigels' accompanying text presents Husain's representations solely as parol evidence to rebut ARY's claim that paragraph 4(c) was a financing contingency in ARY's favor, *i.e.*, ARY as an affected party. As evidenced by ARY's reply to the Krigels' pleading, it certainly did not interpret these arguments as estoppel based. Nor did the district court.

We do acknowledge that "[i]n considering a motion for summary judgment under K.S.A. 60-256, pleadings are to be liberally construed in favor of the party opposing the motion." *Oller v. Kincheloe's, Inc.*, 235 Kan. 440, 448, 681 P.2d 630 (1984) (quoting *Voth v. Chrysler Motor Corporation*, 218 Kan. 644, Syl. ¶ 1, 545 P.2d 371 [1976]). Furthermore, the Krigels cite *Turon State Bank v. Bozarth*, 235 Kan. 786, 684 P.2d 419 (1984), to suggest that since they alleged facts to the district court which could support a theory of estoppel, their failure to characterize those facts as estoppel should not result in summary judgment being entered against them.

The Krigels' reliance on these authorities is misplaced. Following a bench trial, the district court in *Bozarth* construed the facts to support estoppel as a defense. This court rejected plaintiff's argument that it had not been affirmatively pled and held the facts constituted notice of this defense to the plaintiff, which nullified any possible unfairness. In the instant case, however, absolutely no one understood that any of the Krigels' numerous pleadings con-

tained estoppel as a theory until the Krigels' appellate brief was filed. That is too late for our consideration. *Dalmasso,* 269 Kan. at 765.

The Krigels essentially ask us to impose an affirmative duty upon the district court to raise legal theories and arguments for a party during the summary judgment process. In effect, the Krigels invite us to require the district court to apply the review standards governing a motion to dismiss under K.S.A. 60-212(b)(6) (failure to state a claim upon which relief can be granted) to the summary judgment process under K.S.A. 60-256. We decline to do so. Indeed, in *Frontier Ditch Co. v. Chief Engineer of Div. of Water Resources,* 237 Kan. 857, 864, 704 P.2d 12 (1985), we held the trial court erred in raising *sua sponte* the affirmative defense of statute of limitations to defendant's argument when it granted summary judgment to the plaintiff. See *Reebles, Inc. v. Bank of America, N.A.,* 29 Kan. App. 2d 205, 213, 25 P.3d 871 (2001) (appellate court will not review grant of summary judgment against plaintiff on issue of estoppel because it did not raise estoppel as a cause of action in its pleadings for the trial court's consideration); *Midwest Iron and Metal, Inc. v. Zenor Elec. Co.,* 28 Kan. App. 2d 353, 355, 19 P.3d 181 (2000) (appellate court will not review grant of summary judgment against plaintiff on issue of breach of implied warranty because it did not raise the claim in response to defendant's motion for judgment on all issues or on its own motion to reconsider the grant of summary judgment).

Though somewhat alike, the processes involving motions for summary judgment and motions to dismiss contain some fundamental differences. A summary judgment motion typically is filed after discovery has been completed as in the instant case, and the parties are aware of almost all of the facts and all the legal claims. See *Montoy v. State,* 275 Kan. 145, 148-49, 62 P.2d 228 (2003) (Ordinarily, a summary disposition of a pending case before the district court should not be granted until discovery is complete.). By contrast, a motion to dismiss typically is filed much earlier in the case when many facts are undiscovered and the legal theories may be in flux. As the court stated in *Noel v. Pizza Hut, Inc.,* 15 Kan. App. 2d 225, 234, 805 P.2d 1244, *rev. denied* 248 Kan. 996

(1991), when it reviewed a motion to dismiss, "[t]he development of these facts and the legal theory to which they may be appended is left to the discovery and pretrial procedures. . . . As the matter develops, the precise theory may be shifted as the facts warrant." Accordingly, the court considering a motion to dismiss must "determine whether those pleaded facts and inferences state a claim, not only on the theory which may be espoused by the plaintiffs, but on *any possible theory* we can divine." 15 Kan. App. 2d at 231.

The district court did not err in granting summary judgment to ARY on the issue of estoppel.

Issue 3: *Did the district court err in granting summary judgment because genuine issues of material fact remained on the issue of waiver?*

The Krigels argue that genuine issues of material fact on additional grounds exist to prevent summary judgment for ARY. Specifically, they claim that through the words and actions of ARY representatives, ARY waived paragraph 4(c) (the Foothill Capital consent to continued financing provision) and paragraph 8(d) (the written notice provision) of the SPA. ARY responds that we should not consider these arguments because the Krigels did not allege waiver in the district court. In the alternative, ARY claims that even if waiver had been sufficiently raised, no waiver occurred, either in writing or by implication.

Our first step, as with issue 2, is to determine whether the theory of waiver was raised below. If not, the issue cannot be raised on appeal. See *Dalmasso*, 269 Kan. at 765. We initially observe that the district court did mention waiver in its journal entry of judgment filed on May 29, 2002. A careful review of the pleadings reveals the waiver issue was actually raised preemptively by ARY in its motion for summary judgment, and in ARY's reply to the Krigels' response. Specifically, ARY acknowledged that the Krigels had argued waiver of paragraph 4(c) in other litigation between the parties based upon Husain's alleged representations that ARY would pay cash if acceptable financing were not obtained. ARY then presented arguments on why waiver did not apply to the in-

stant case. In ARY's reply memorandum of April 2, 2002, it claimed, among other things:

"Whatever Mr. Husain purportedly said, *the SPA requires waivers to be made in writing*. *See* SPA § 8(d). Thus, Mr. Husain could have made that statement a thousand times without any legal effect under the terms of the SPA. The SPA was null and void by its terms as of December 19, 2000."

We therefore conclude the general issue of waiver was properly raised by a party, was properly considered by the district court, and is properly before this court on appeal. Consequently, we continue our analysis by examining Missouri's legal definition of waiver:

"The intentional relinquishment of a known right, on the question of which intention of the party charged with waiver is controlling, and if not shown by express declarations but implied by conduct, there must be a clear, unequivocal, and decisive act of the party showing, such purpose, and so consistent with intent to waive that no other reasonable explanation is possible." *Errante v. Kadean Real Estate Service, Inc.*, 664 S.W.2d 27, 29 (Mo. App.1984).

In the instant case, the district court found that the SPA requires waivers, and all other communications permitted or required under the SPA, to be in writing. While it was alleged that ARY's representative, Husain, may have orally told Scott that ARY would close the transaction even without continued financing from Foothill Capital, the court found that neither Husain nor any other representative of ARY ever waived the financing requirement of paragraph 4(c) in writing. Consequently, ARY did not waive the requirement. As a result, the district court held that by the express terms of paragraph 4(c), the SPA and consulting agreement were null and void as of December 19, 2000.

We agree with the district court. There is no evidence of ARY's written waiver.

We next consider the Krigels' apparent argument that ARY impliedly waived the written waiver requirement of paragraph 8(d). As support they cite *Keltner v. Sowell*, 926 S.W.2d 528 (Mo. App. 1996), which holds that the requirement of a written notice in a contract may be waived by an oral agreement of the parties or by their conduct. In response, ARY alleges this specific argument was never raised in or addressed by the district court. We agree. The district court's journal entry makes no mention of this issue, nor is

it found in any of the numerous pleadings we have carefully reviewed.

Even if we disregard this procedural bar, our consideration of this specific argument provides no relief to the Krigels. Husain's alleged representations about paying cash instead of refinancing that were made before November 21, the date of the SPA's execution, are negated by the SPA's integration provision. ARY's conduct and representations after December 19 — Husain's alleged representations, ARY's continued negotiations for refinancing, and counsel's two attempts to extend the bankruptcy's effective date — are of no consequence because the SPA was already null and void due to the failure of Foothill Capital's consent to financing by the deadline. Under Missouri law, a condition subsequent cannot be waived after the failure of the condition. *Baumann v. Brittingham,* 759 S.W.2d 880, 881 (Mo. App. 1988) (Defendants' continued pursuit of financing after the deadline was not an implied waiver of the contingency provision because the failure of the contingency made the contract void.); *Errante v. Kadean Real Estate Service, Inc.,* 664 S.W. 2d at 29.

We acknowledge that ARY's attorney, Jevinsky, allegedly did request in his December 19 letter that the December 19 deadline be extended until January 18. Even resolving the facts and inferences which may reasonably be drawn from this evidence in favor of the Krigels as we are required to do in reviewing summary judgments, however, Jevinsky was clearly only extending by 30 days the date for ARY to receive Foothill Capital's consent to such financing. Extending the deadline for fulfilling the condition is inconsistent with an intent to waive the condition, *i.e.,* intentionally relinquishing it as required by Missouri law. See *Fleischer v. McCarver,* 691 S.W.2d 930 (Mo. App. 1985) (sellers extended the financing contingency deadline in writing by one week and court held they never waived financing contingency). Accordingly, Jevinsky was neither expressly nor impliedly waiving the condition of Foothill Capital's consent to financing or approving the replacement of the financed $8 million with equivalent amounts of ARY's cash.

We hold ARY did not make any written waiver of the condition requiring Foothill Capital's consent to financing, nor did it make

any implied waiver of the requirement that waivers be in writing. Consequently, the district court did not err in granting summary judgment to ARY on this issue.

Issue 4: *Did the district court err in denying the Krigels' motion for summary judgment because the court misinterpreted the contract?*

For the Krigels' last argument, they claim the district court erred in denying their motion for summary judgment on their counterclaim for breach of contract and on ARY's amended petition. They specifically argue the court erred in interpreting paragraph 4(c) of the SPA; since only the Krigels' were required to waive the unfulfilled financing condition, there was no valid reason for ARY not to close the transaction. According to the Krigels, ARY's failure to pay the unsecured creditors of Krigel's, Inc., on the effective date of the bankruptcy plan therefore constituted a breach of the contract, and consequently, the Krigels are entitled to the escrowed funds.

These arguments were addressed and rejected earlier in the opinion when we considered the district court's grant of summary judgment to ARY. For those same reasons, the district court correctly denied the Krigels' motion for summary judgment.

Affirmed.

ABBOTT, J., not participating.

BRAZIL, S.J., assigned.